# EXHIBIT A

PLD-C-001

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| David R. Beck    SBN 124372 BECK & MATHIESEN, APC 700 Frederick Street, Suite 306 Santa Cruz, CA 95062 TELEPHONE NO.: (831) 429-0181   FAX NO. (Optional): (831) 429-5617 E-MAIL ADDRESS (Optional):    Dave@BeckMathiesen.com ATTORNEY FOR (Name):   Plaintiff URSULA SCHOLZ-GROSS | ELECTRONICALLY FILED Superior Court of California County of Santa Cruz 12/18/2018 4:39 PM Alex Calvo, Clerk By: Helena Hanson, Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Santa Cruz
    STREET ADDRESS: 701 Ocean Street
    MAILING ADDRESS:
    CITY AND ZIP CODE: Santa Cruz, CA 95060
    BRANCH NAME:

PLAINTIFF:   URSULA SCHOLZ-GROSS

DEFENDANT:   STARBUCKS CORPORATION, a Washington Corporation, dba
STARBUCKS COFFEE COMPANY

[X] DOES 1 TO  10

**CONTRACT**

[X] COMPLAINT    [ ] AMENDED COMPLAINT (Number) :

[ ] CROSS-COMPLAINT    [ ] AMENDED CROSS-COMPLAINT (Number) :

| Jurisdiction (check all that apply): | CASE NUMBER: |
|---|---|
| [ ] ACTION IS A LIMITED CIVIL CASE  Amount demanded [ ] does not exceed $10,000         [ ] exceeds $10,000 but does not exceed $25,000  [X] ACTION IS AN UNLIMITED CIVIL CASE (exceeds $25,000)  [ ] ACTION IS RECLASSIFIED by this amended complaint or cross-complaint         [ ] from limited to unlimited         [ ] from unlimited to limited | 18CV03641 |

1. Plaintiff* (name or names):  URSULA SCHOLZ-GROSS ("SCHOLZ-GROSS")

   alleges causes of action against defendant* (name or names):  STARBUCKS CORPORATION, a Washington Corporation, dba STARBUCKS COFFEE COMPANY ("STARBUCKS")

2. This pleading, including attachments and exhibits, consists of the following number of pages:  6

3. a.  Each plaintiff named above is a competent adult
    [ ] except plaintiff (name) :
        (1) [ ] a corporation qualified to do business in California
        (2) [ ] an unincorporated entity (describe) :
        (3) [ ] other (specify) :

  b. [ ] Plaintiff (name) :
    a. [ ] has complied with the fictitious business name laws and is doing business under the fictitious name (specify) :

    b. [ ] has complied with all licensing requirements as a licensed (specify) :
  c. [ ] Information about additional plaintiffs who are not competent adults is shown in Attachment 3c.

4. a.  Each defendant named above is a natural person
    [X] except defendant (name) :                 [ ] except defendant (name) :
    STARBUCKS
    (1) [ ] a business organization, form unknown      (1) [ ] a business organization, form unknown
    (2) [X] a corporation                   (2) [ ] a corporation
    (3) [ ] an unincorporated entity (describe) :     (3) [ ] an unincorporated entity (describe) :

    (4) [ ] a public entity (describe) :          (4) [ ] a public entity (describe) :

    (5) [ ] other (specify) :              (5) [ ] other (specify) :

Form Approved for Optional Use Judicial Council of California PLD-C-001 (Rev. January 1, 2007)    CEB Essential Forms ceb.com    **COMPLAINT - Contract**    Code of Civil Procedure, § 425.12

SCHOLZ-GROSS, URSULA

PLD-C-001

| SHORT TITLE:<br>Scholz-Gross v. Starbucks | CASE NUMBER: |
|---|---|

4.  (Continued)
    b.    The true names of defendants sued as Does are unknown to plaintiff.
        (1) ☒ Doe defendants (specify Doe numbers):   1 - 5   were the agents or employees of the named
              defendants and acted within the scope of that agency or employment.
        (2) ☒ Doe defendants (specify Doe numbers):   6 - 10   are persons whose capacities are unknown to
              plaintiff.
    c.  ☐ Information about additional defendants who are not natural persons is contained in Attachment 4c.
    d.  ☐ Defendants who are joined under Code of Civil Procedure section 382 are (names):

5.  ☐ Plaintiff is required to comply with a claims statute, and
    a.  ☐ has complied with applicable claims statutes, or
    b.  ☐ is excused from complying because (specify):

6.  ☐ This action is subject to  ☐ Civil Code section 1812.10  ☐ Civil Code section 2984.4.

7.  This court is the proper court because
    a.  ☐ a defendant entered into the contract here.
    b.  ☐ a defendant lived here when the contract was entered into.
    c.  ☐ a defendant lives here now.
    d.  ☒ the contract was to be performed here.
    e.  ☐ a defendant is a corporation or unincorporated association and its principal place of business is here.
    f.  ☒ real property that is the subject of this action is located here.
    g.  ☒ other (specify):
        Defendant is engaged in business in Santa Cruz County.

8.  The following causes of action are attached and the statements above apply to each (each complaint must have one or
    more causes of action attached):
    ☒ Breach of Contract
    ☐ Common Counts
    ☒ Other (specify):  Breach of Warranty;
                 General Negligence.

9.  ☐ Other allegations:

10.  Plaintiff prays for judgment for costs of suit; for such relief as is fair, just, and equitable; and for
    a.  ☒ damages of: $  According to proof.
    b.  ☒ interest on the damages
        (1) ☒ according to proof
        (2) ☐ at the rate of (specify):    percent per year from (date):
    c.  ☒ attorney's fees
        (1) ☐ of: $
        (2) ☒ according to proof.
    d.  ☐ other (specify):

11.  ☐ The paragraphs of this pleading alleged on information and belief are as follows (specify paragraph numbers):

Date: December  18, 2018

DAVID R. BECK, Attorney for Plaintiff SCHOLZ-GROSS
_____
(TYPE OR PRINT NAME)

▶

_____
(SIGNATURE OF PLAINTIFF OR ATTORNEY)

(If you wish to verify this pleading, affix a verification.)

CEB Essential
ceb.com Forms

SCHOLZ-GROSS, URSULA

PLD-C-001(1)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Scholz-Gross v. Starbucks | |

_____FIRST_____        **CAUSE OF ACTION–Breach of Contract**
(number)

ATTACHMENT TO ☒ Complaint   ☐ Cross-Complaint

*(Use a separate cause of action form for each cause of action.)*

BC-1. Plaintiff *(name)*:   URSULA SCHOLZ-GROSS

    alleges that on or about *(date)*:   December, 1995
    a ☒ written   ☐ oral   ☐ other *(specify)*:   Commercial Lease ("Lease")
    agreement was made between *(name parties to agreement)*: Heinz P. Gross, individually and as a Trustor and Trustee of
                                                              the Heinz Gross Living Trust; and Starbucks
    ☒ A copy of the agreement is attached as Exhibit A, and
    ☒ The essential terms of the agreement ☒ are stated in Attachment BC-1 ☐ are as follows *(specify)*:

BC-2. On or about *(dates)*: August 25, 2017
    defendant breached the agreement by ☐ the acts specified in Attachment BC-2 ☒ the following acts
    *(specify)*:
    Failing to maintain the plumbing in good order. Failing to properly disclose and repair a plumbing
    problem that occurred a couple weeks before August 25, 2017, which caused a flood of black water
    in the basement of the Premises, photos of which are attached as EXHIBIT C.

BC-3. Plaintiff has performed all obligations to defendant except those obligations plaintiff was prevented or
    excused from performing.

BC-4. Plaintiff suffered damages legally (proximately) caused by defendant's breach of the agreement
    ☐ as stated in Attachment BC-4 ☒ as follows *(specify)*:
    Damages at a minimum are $157,184 – comprised of $8,066 loss of furniture, fixtures, and
    equipment; $85,000 for the replacement of granite flooring; and $64,118 for tile removal, drywall,
    tape, paint, baseboard, tile installation, and project management.

BC-5. ☒ Plaintiff is entitled to attorney fees by an agreement or a statute
    ☐ of $
    ☒ according to proof.
BC-6. ☐ Other:

                                                                                    Page ___3___
                                                                                    Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
PLD-C-001(1) [Rev. January 1, 2007]
CEB | Essential
ceb.com | Forms

**CAUSE OF ACTION–Breach of Contract**

Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

SCHOLZ-GROSS, URSULA

1 | FIRST CAUSE OF ACTION

2 | ATTACHMENT BC-1

3

4 |     Plaintiff is a successor in interest to Heinz P. Gross,

5 | individually and as trustor and trustee of the Heinz Gross Living

6 | Trust. At §6.1, the Lease provided that "[STARBUCKS], at [STARBUCK'S]

7 | expense, shall keep the Premises in good order and repair, including,

8 | but not limited to, maintaining all plumbing." Although the Lease

9 | provided that Landlord will carry Liability Insurance, and that the

10 | parties waive subrogation, the Waiver of Subrogation is **superceded** by

11 | a "Settlement And Release," attached as **Exhibit B,** as to "plumbing

12 | installed by STARBUCKS or its contractors." STARBUCKS installed all

13 | the plumbing at the Premises, and out to the street, and in the

14 | basement. Indeed, pursuant to the "Settlement And Release," and

15 | despite the Waiver of Subrogation, STARBUCKS has repaired failures in

16 | 1999, 2013, 2014, and 2017.

17

18

19

20

21

22

23

24

25

26

27

28

PLD-C-001(1)

| SHORT TITLE:<br>Scholz-Gross v. Starbucks | CASE NUMBER: |
|---|---|

___SECOND___   **CAUSE OF ACTION- Breach of Contract - Warranty**
(number)

ATTACHMENT TO ☒ Complaint   ☐ Cross-Complaint

*(Use a separate cause of action form for each cause of action.)*

BC-1. Plaintiff *(name)*:   URSULA SCHOLZ-GROSS

alleges that on or about *(date)*:   April 23, 1998
a ☒ written   ☐ oral ☐ other *(specify)*:
agreement was made between *(name parties to agreement)*:   URSULA SCHOLZ GROSS and STARBUCKS

☒ A copy of the agreement is attached as Exhibit B, and
☒ The essential terms of the agreement ☐ are stated in Attachment BC-1 ☒ are as follows *(specify)*:

"STARBUCKS will warrant... the plumbing installed by STARBUCKS or its contractors..."  The
warranty is still in effect.  STARBUCKS installed all the plumbing of the Premises, and out to the
street, and in the basement.  Indeed, pursuant to the Warranty, STARBUCKS has repaired
plumbing failures in 1999, 2013, 2014, and 2017.

BC-2. On or about *(dates)*: August 25, 2017.
defendant breached the agreement by ☐ the acts specified in Attachment BC-2 ☒ the following acts
*(specify)*:
Failure to honor the Warranty after a flood of black water in the basement of the Premises, photos
of which are attached as EXHIBIT C.

BC-3. Plaintiff has performed all obligations to defendant except those obligations plaintiff was prevented or
excused from performing.

BC-4. Plaintiff suffered damages legally (proximately) caused by defendant's breach of the agreement
☐ as stated in Attachment BC-4 ☒ as follows *(specify)*:
Damages at a minimum are $157,184 -- comprised of $8,066 loss of furniture, fixtures, and
equipment; $85,000 for the replacement of granite flooring; and $64,118 for tile removal, drywall,
tape, paint, baseboard, tile installation, and project management.

BC-5. ☒ Plaintiff is entitled to attorney fees by an agreement or a statute
☐ of $
☒ according to proof.
BC-6. ☐ Other:

Page ___5___

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
PLD-C-001(1) [Rev. January 1, 2007]
CEB | Essential
ceb.com | Forms

CAUSE OF ACTION- Breach of Contract

Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

SCHOLZ-GROSS, URSULA

PLD-PI-001(2)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Scholz-Gross v. Starbucks | |

THIRD    **CAUSE OF ACTION- General Negligence**    Page   6
(number)
ATTACHMENT TO ☒ Complaint    ☐ Cross-Complaint

(Use a separate cause of action form for each cause of action.)

GN-1, Plaintiff (name):  URSULA SCHOLZ-GROSS

alleges that defendant (name): STARBUCKS CORPORATION, dba STARBUCKS COFFEE COMPANY

☒ Does   1   to 10

was the legal (proximate) cause of damages to plaintiff.   By the following acts or omissions to act, defendant
negligently caused the damage to plaintiff
on (date):  July or August, 2017
at (place):  the Starbucks store located on Pacific Avenue in Santa Cruz

(description of reasons for liability) :

Sewage backed up in the lines and toilets.  STARBUCKS  pursuant to its contractual and warranty
obligations undertook to have the pipes cleared.  A plumber hired by STARBUCKS snaked the lines
and failed to clear the clog, and/or damaged a check valve with the snake, and/or caused the
check valve to fail due to extreme head pressure caused by the clog.

The check valve failure caused many gallons of black water to flood the basement of the
Premises as depicted in the photographs attached as EXHIBIT C.  This resulted in damages in an
amount not less than $157,184 as set forth previously in this Complaint.

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(2) [Rev. January 1, 2007]
**CAUSE OF ACTION- General Negligence**
Code of Civil Procedure 425.12
www.courtinfo.ca.gov

CEB | Essential
ceb.com | Forms

SCHOLZ-GROSS, URSULA

EXHIBIT A

# COMMERCIAL LEASE

THIS COMMERCIAL LEASE (the "Lease"), is made and entered into as of December, 1995, by and between Heinz P. Gross, individually and as Trustor and Trustee of The Heinz Gross Living Trust dated November 9, 1995 ("Landlord"); and Starbucks Corporation, a Washington corporation ("Tenant").

 1. **PREMISES.** Landlord is the owner of a building located at 1335 Pacific Avenue, Santa Cruz, California (the "Building") and situated upon the real property legally described in Exhibit A attached hereto and by this reference incorporated herein (the "Property"). In consideration of the mutual promises, covenants and conditions herein set forth, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord that certain premises in the Building containing approximately 1,487 square feet of floor area on the main floor of the Building and approximately 400 square feet of adjacent private outside patio space (the "Premises"). Landlord shall have the nonexclusive right to use restroom facilities located in the Premises during Tenant's normal hours of business operations.

 2. **TERM.**

  2.1 Term. The initial term of this Lease shall be for ten (10) years, commencing on the Rent Commencement Date (as defined in Section 3.1 below), and ending on the last day of the month in which the 10th anniversary of the Rent Commencement Date occurs (the "Expiration Date"), unless sooner terminated or extended as provided herein (the "Initial Term"). If the Expiration Date of the Lease occurs after September 30 and prior to the succeeding February 28, the term of the Lease shall automatically extend until the succeeding March 1. Promptly after the Rent Commencement Date, Landlord and Tenant shall execute a memorandum stating the actual Commencement Date (as defined in Section 2.2, below), Rent Commencement Date and Expiration Date. For purposes of this Lease, the word "Term" shall mean the Initial Term and any Extension Term (as defined in Section 2.4 below).

  2.2 Delivery. The Lease shall commence upon delivery of the Premises by Landlord and acceptance of the Premises by Tenant (the "Commencement Date"). Tenant shall not be deemed to have accepted possession of the Premises until each of the following conditions has been satisfied: (a) Landlord shall have completed any work necessary to comply with Sections 4.1 and 4.2; (b) Landlord and Tenant have executed and delivered a written notice of delivery and acceptance of the Premises in the form attached hereto as Exhibit B; and (c) Landlord has delivered a fully executed copy of this Lease to Tenant. Tenant shall not be required to take possession of the Premises prior to January 15, 1996 (the "Scheduled Delivery Date").

  2.3 Lease Year. For the purpose of this Lease, the term "Lease Year" shall mean and refer to that period of twelve (12) full consecutive calendar months beginning with the first full calendar month of the Term and each subsequent period of twelve (12)

STARBUCKS
REAL ESTATE

consecutive calendar months during the Term, provided that if the Term commences on other than the first day of a calendar month, then the initial fractional month of the Term plus the next succeeding twelve (12) full calendar months shall constitute the first Lease Year of the Term.

    2.4    Extension.

        2.4.1  Tenant shall have the option to extend the term of this Lease for two (2) consecutive five (5) year period(s) (each an "Extension Term"), upon the same terms and conditions as contained in this Lease. The rent for each Extension Term shall be as set forth in Article 3 below. To exercise an extension option, Tenant shall give Landlord written notice by certified mail at least one hundred eighty (180) days prior to the then-current Expiration Date ("Tenant's Extension Notice"). Tenant's Extension Notice shall be effective to extend the Term of the Lease without further documentation except as expressly provided in Section 2.4.2 below.

        2.4.2  At any time after Tenant has exercised its option to extend this Lease and the rent for the Extension Term has been finally determined, Landlord and Tenant, upon request of either, will sign and acknowledge a written memorandum evidencing Tenant's exercise of the option and stating the date to which such Extension Term will extend and the rental rates that will be applicable during such Extension Term.

    3.    RENT.

        3.1   Rent. Tenant shall pay to Landlord at the address stated herein, or to such other person or at such other place as Landlord may designate in writing, rent as follows ("Rent"):

| Lease Years | Monthly Installment | Annual Rent |
|---|---|---|
| 1-5 | $2,900.00 | $34,800.00 |
| 6-10 | $3,335.00 | $40,020.00 |

    Tenant shall commence to pay Rent and all other charges hereunder on the [date that is ninety (90) days after the] Commencement Date (the "Rent Commencement Date") and shall continue to pay Rent in monthly installments on or before the first day of every month thereafter during the Term. Rent for any period during the Term less than one calendar month shall be prorated on a daily basis based on a three hundred sixty-five (365) day year.

STARBUCKS
REAL ESTATE

3.2   Extension Term Rent.  Rent for each Extension Term shall be as follows:

| Lease Years | Monthly Installment | Annual Rent |
|---|---|---|
| 11-15 | $3,835.25 | $46,023.00 |
| 16-20 | $4,410.64 | $52,926.48 |

3.3   Security Deposit.  Landlord acknowledges that Tenant has delivered to Landlord, in trust, the sum of Ten Thousand Dollars ($10,000) (the "Deposit") as security for the performance by Tenant of its obligations under this Lease.  If Tenant is not then in default, beyond any applicable cure period, the Deposit shall be applied to the Rent due in months 57 through 60 of the Initial Term or, if not so applied, the Deposit or any balance thereof shall be returned to Tenant upon the expiration or termination of this Lease.  If Tenant defaults in respect of any of the terms, provisions, covenants or conditions of this Lease beyond any applicable notice and cure period, including but not limited to payment of Rent and additional rent, Landlord may, but shall not be required to, use, apply or retain the whole or any appropriate part of the Deposit for the payment of any Rent and additional rent in default or for reimbursement of any reasonable expense that Landlord incurs because of Tenant's default.  If the Deposit is so applied then Tenant shall, within thirty (30) days after Landlord's written request, deposit additional money with Landlord sufficient to restore the Deposit to its original amount.

3.4   Key Money.  Tenant shall pay Landlord the sum of Forty-five Thousand Dollars ($45,000) upon the Commencement Date.

4.   CONDITION OF THE PREMISES, POSSESSION AND TENANT ALLOWANCE.

4.1   Condition of the Premises.  Landlord represents and warrants that, as of the Commencement Date, all structural parts of the Premises including, without limitation, the foundation, roof, exterior walls, plumbing, electrical and other mechanical systems (a) are in sound condition and (b) are in good, workable and sanitary order, condition, and repair at the time of delivery of the Premises to Tenant.  Landlord shall correct any latent defects promptly after Tenant notifies Landlord of any such defect.  Landlord represents and warrants that it has disclosed to Tenant any conditions or restrictions within Landlord's actual knowledge that would adversely affect Tenant's store design, construction and use as contemplated by this Lease.

4.2   Landlord's Obligations.  Except for (a) any work necessary to bring the Premises or the Building into the condition required under Section 4.1 and (b) removal of all personal property and fixtures belonging to Landlord or its prior tenant, Landlord shall not perform any work in the Premises and Tenant shall accept delivery of the Premises in its present condition.  Tenant may use or dispose of any personal property or fixtures remaining in the Premises upon delivery.  Landlord shall notify Tenant in writing when the Premises is ready for Tenant's occupancy.

STARBUCKS
REAL ESTATE

If the Premises and the Building are not in the condition required under this Article on the Scheduled Delivery Date then Tenant may, at its option, either (a) delay acceptance of possession until the Premises are in the condition required under this Article and pursue its remedies under Section 4.3; or (b) accept possession of the Premises and complete all work necessary to bring the Premises into the required condition. If Tenant elects to proceed under the foregoing subsection (b), then Landlord shall reimburse Tenant for the actual cost of such work, plus an administrative surcharge of fifteen percent (15%) to compensate Tenant for its employees' time, within thirty (30) days of receipt of an invoice for such sums. Tenant's and its contractor's determination of the cost of such work shall be final and binding on Landlord and Landlord acknowledges that Landlord can control the cost by performing the work under this Article in a timely manner. If Landlord does not reimburse Tenant as required by this Section, then Tenant may offset such sum against Base Rent and all other charges until such sum has been fully recouped.

4.3    Delay in Delivery of Possession.    Tenant is entitled to possession of the Premises on the Scheduled Delivery Date. Landlord acknowledges that Tenant intends to start construction of Tenant's improvements on January 28, 1996 (the "Construction Start Date"). If the Commencement Date does not occur within three (3) months of the Construction Start Date, Tenant, at its option, may terminate this Lease upon written notice to Landlord. If Tenant elects to terminate this Lease, Landlord shall reimburse Tenant for all of Tenant's expenses incurred in connection with this Lease, including, without limitation, site selection and lease negotiation costs and expenses (including the allocated cost of in-house personnel). Landlord shall also return all monies previously deposited by Tenant, if any.

4.4    Tenant's Allowance.    In addition to Landlord's obligations under Sections 4.1 and 4.2 above, Landlord shall provide Tenant with an improvement allowance of Ten Thousand Dollars ($10,000) which shall be paid through abatement of Rent in the amount of One Hundred Sixty-five Dollar ($165) per month commencing on the Rent Commencement Date and continuing until the improvement allowance is fully amortized.

5.    USE.

5.1    Use.    Tenant may use and occupy the Premises for a coffee store and related uses including, at Tenant's discretion, the retail sale of (a) fresh whole and ground coffee beans, (b) coffee by the cup, (c) espresso-based drinks, (d) pre-packaged coffee beans, (e) teas and spices, (f) coffee and tea related equipment and supplies, (g) books, magazines and newspapers, (h) baked goods, (i) assorted salads, sandwiches and gourmet food items, (j) seasonal, promotional and Starbucks branded merchandise, and (k) other items that Starbucks makes available for sale in the ordinary course of business at its other stores and for any other lawful use that is not in conflict with a written exclusive use granted to another tenant in the Building prior to the date of this Lease.

5.2    Compliance with Law.    During the Term, Tenant, at its expense, shall comply promptly with all laws, rules, and regulations made by any governmental authority having jurisdiction over Tenant's use of the Premises pertaining to (a) the physical condition

STARBUCKS
REAL ESTATE

of any improvements constructed by Tenant in the Premises; and (b) Tenant's business operations in the Premises. Tenant shall not be required to make any seismic or structural upgrades, repairs, improvements or alterations to the Premises or the Building in order to comply with the requirements of this Section 5.2. Landlord, at its expense, shall comply with all other laws, rules, regulations, and ordinances made by any governmental authority affecting the Premises, Building and/or the Property other than handicapped accessibility requirements.

5.3    Operations. Tenant shall operate its business in such manner and at such hours as Tenant considers proper in Tenant's business judgment.

5.4    Exclusivity. Landlord shall not use or allow any other person or entity (except Tenant) to use any portion of the Property for the sale of (a) freshly ground or whole coffee beans, (b) espresso or espresso-based coffee drinks, or (c) gourmet, brand-identified brewed coffee. This restriction shall also apply to kiosks and carts.

6.    MAINTENANCE, REPAIRS, AND ALTERATIONS.

6.1    Tenant's Obligations. Subject to the provisions of Sections 6.2, 6.3 and 9, and except for damage caused by fire or other casualty, whether or not insured or insurable, Tenant, at Tenant's expense, shall keep the Premises in good order and repair, including, but not limited to, maintaining all plumbing, HVAC, electrical and lighting facilities and equipment within the Premises, and the sidewalks, landscaping, drainage systems, store front, doors, and plate glass of the Premises. At Tenant's request, Landlord shall transfer or assign to Tenant all warranties, express or implied, under any contract or subcontracts relating to any improvements or equipment Landlord built or installed within the Premises, including, without limitation, the warranty for the HVAC system. Notwithstanding any provision to the contrary, Tenant's obligations under this Section shall not include making (a) any repair or improvement necessitated by the negligence or willful misconduct of Landlord, its agents, employees or servants; (b) any repair or improvement caused by Landlord's failure to perform its obligations hereunder or under any other agreement between Landlord and Tenant; or (c) any structural or seismic repairs, improvements or alterations to the Premises or the Building.

6.2    Landlord's Obligations. Except for repairs and replacements to the Premises that Tenant must make under Section 6.1, Landlord shall pay for and make all other repairs and/or replacements to the Premises. Such repairs, replacements and maintenance shall include the upkeep of the roof, foundation, exterior walls, interior structural walls, and all structural components of the Building. Landlord shall not be required to maintain the interior surface of exterior walls, windows, doors or plate glass and store front (except where maintenance of the same is caused by Landlord's negligence or failure to perform its obligations under this Section). Landlord shall make all repairs under this Section promptly after Landlord learns of the need for such repairs but in any event within thirty (30) days after Tenant notifies Landlord of the need for such repairs. If Landlord fails to make such repairs within thirty (30) days after Tenant's notice (except when the repairs require more than thirty (30) days for performance and Landlord commences the

STARBUCKS
REAL ESTATE

repair within thirty (30) days and diligently pursues the repair to completion), Tenant may, at its option, undertake such repairs and deduct the cost thereof from the installments of Rent and Estimated Monthly Rent next falling due. Notwithstanding the foregoing, in the event of an emergency, Tenant may give Landlord such shorter notice as is practicable under the circumstances, and if Landlord fails to make such repairs immediately, Tenant may immediately undertake such repairs and deduct the cost thereof from the installments of Rent and all other charges next falling due.

6.3   Surrender. Upon the expiration or termination of this Lease, Tenant shall surrender the Premises to Landlord in broom clean condition, except for ordinary wear and tear and damage caused by fire or other casualty, whether or not insured or insurable.

6.4   Landlord's Rights. If Tenant fails to perform Tenant's obligations under this Article, Landlord may, but shall not be required to, enter upon the Premises, after thirty (30) days prior written notice to Tenant, and put the same in good order, condition and repair, and the reasonable costs thereof shall become due and payable as additional rental to Landlord together with Tenant's next Rent installment falling due after Tenant's receipt of an invoice for such costs. Notwithstanding the foregoing, Landlord's rights under this Section shall be subject to Section 23.14.

6.5   Alterations and Additions.

6.5.1   Initial Improvements. Tenant, at Tenant's cost, may install such initial tenant improvements in the Premises as Tenant deems necessary or desirable for the conduct of Tenant's business therein (the "Initial Improvements"). Tenant shall submit the plans and specifications (the "Plans") for any structural elements of the Initial Improvements to Landlord for Landlord's review and approval. Landlord shall have a period of fourteen (14) days (the "Review Period") to review the Plans. Landlord shall not unreasonably withhold, condition or delay its approval of the Plans. Landlord shall be deemed to have approved the Plans as presented unless, on or before the last day of the Review Period, Landlord has delivered to Tenant a written description of the specific structural items in the Plans that are not acceptable and a description of the specific changes that must be made to the Plans to secure Landlord's approval. Tenant shall either (a) submit modified plans for approval; or (b) terminate the Lease if Landlord's requested revisions are not acceptable to Tenant in its sole discretion. The review and approval process described above shall continue until such time as Landlord has approved the Plans in writing (the "Final Plans").

6.5.2   Subsequent Improvements. After the installation of the Initial Improvements, Tenant may make such interior non-structural alterations, improvements and additions to the Premises including, without limitation, changing color schemes, installing new countertops, flooring, wall-covering and modifying the layout of the tenant fixtures, as Tenant deems necessary or desirable without obtaining Landlord's consent. Notwithstanding the foregoing, Tenant shall not make any alterations, improvements, additions or repairs in, on, or about the Premises which affect the structure or the mechanical systems of the Building without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Landlord shall be deemed to have approved any

STARBUCKS
REAL ESTATE

subsequent improvement proposed by Tenant unless Landlord disapproves of Tenant's proposal in writing within fourteen (14) days of receiving Tenant's proposal and request for consent.

6.5.3 <u>Liens</u>. Before commencing any alterations, additions or improvements using outside contractors, Tenant shall notify Landlord of the expected commencement and completion dates of the work. Tenant shall not permit any mechanics' or materialmen's liens to be levied against the Premises for any labor or material furnished to Tenant or to its agents or contractors; provided, however, that Tenant shall not be required to pay or otherwise satisfy any claims or discharge such liens so long as Tenant, in good faith and at its own expense, contests the same or the validity thereof by appropriate proceedings and posts a bond or takes other steps acceptable to Landlord that stay enforcement of such lien.

6.6     <u>Ownership and Removal of Improvements, Fixtures, Equipment and Furnishings</u>.

6.6.1 All personal property, furnishings, machinery, trade fixtures, equipment and improvements (trade or otherwise) which Tenant installs in the Premises ("Tenant's Property") shall remain the property of Tenant. Upon the termination or expiration of the Term, Tenant may remove Tenant's Property from the Premises no later than the termination or expiration date. In addition, Tenant may remove from the Premises all items and structural characteristics installed by Tenant that are indicative of Tenant's business and may otherwise "de-identify" the Premises, as Tenant reasonably believes necessary or appropriate for the protection of Tenant's interest in Tenant's trademarks, trade names or copyrights. Tenant shall repair any damage to the Premises or the Building caused by such removal, including patching and filling holes. In no event shall Tenant remove or be required to remove any restrooms, flooring, ceilings, utility or electrical components located inside the walls or HVAC systems. All other utility systems will be capped and returned to a condition compatible with code requirements.

6.6.2 Any of Tenant's Property not removed from the Premises on the date the Lease terminates or expires shall be deemed abandoned and shall thereupon become the property of Landlord. Landlord may possess and dispose of such property provided that Landlord shall not use or permit anyone holding under Landlord to use on the Premises (a) any trademark, trade name, millwork, copyrighted floorplan, copyrighted color palette, or sign used by Tenant in the Premises; or (b) any item that is similar to any other item protected by Tenant's intellectual property rights. This provision shall apply under all circumstances, including default by Tenant under this Lease.

7.     INSURANCE; INDEMNITY.

7.1     <u>Tenant's Insurance</u>. During the Term of this Lease, Tenant shall obtain and keep in full force and effect, the following insurance which may be provided under blanket insurance policies covering other properties as well as the Premises and shall be maintained with an insurance company rated at least A-VIII or better in Best's Insurance

Reports.  Upon Landlord's request, Tenant will provide Landlord with a certificate(s) evidencing such insurance.

7.1.1  Liability Insurance.  Personal injury, bodily injury and property damage insurance, naming Landlord as an additional insured as its interest may appear from time to time, against liability arising out of Tenant's use, occupancy, or maintenance of the Premises and Tenant's outdoor seating area.  Such insurance shall provide coverage for and shall be in an amount of not less than One Million Dollars ($1,000,000) for injury to or death of one person in any one accident or occurrence and in an amount of not less than Two Million Dollars ($2,000,000) for injury to or death of more than one person in any one accident or occurrence.  Tenant's insurance shall be primary with respect to any claim arising out of events that occur in the Premises.

Landlord shall have the right once during the Term to request the Tenant to increase the coverages required under this Section 7.1.1 to such amounts as are then reasonable and customary; and Tenant shall be obligated to increase such coverages, provided the increase does not exceed the coverages Tenant normally maintains with respect to other leased premises which are similar in nature and operation to the business operated by Tenant on the Premises.

7.1.2  Property Insurance.  Commercial property form insurance with a special form endorsement to the extent of at least eighty percent (80%) of the insurable value of Tenant's trade fixtures, equipment and inventory in the Premises.  During the Term, Tenant shall use the proceeds from any such policy or policies of insurance for the repair or replacement of the insured property unless Tenant elects to terminate the Lease under Section 9 hereof.  Landlord shall have no interest in any insurance proceeds Tenant receives for Tenant's Property and Landlord shall sign all documents which are necessary or appropriate in connection with the settlement of any claim or loss by Tenant.  Tenant's policies shall not be contributing with or in excess of any coverage which Landlord shall carry on the Building.

7.2  Landlord's Insurance.  During the Term of this Lease, Landlord shall obtain and keep in full force and effect, the following insurance from an insurance company rated at least A-VIII or better in Best's Insurance Reports.  The insurance required to be carried by Landlord under this Section shall be referred to herein as "Landlord's Insurance."  Upon Tenant's request, Landlord will provide Tenant with a copy of the certificate evidencing Landlord's Insurance.

7.2.1  Liability Insurance.  Bodily injury, personal injury and property damage insurance (to include without limitation contractual liability covering Landlord's obligations under Section 7.5) insuring against claims of bodily injury or death, personal injury or property damage arising out of or in connection with (a) Landlord's activities upon, in or about the Premises; or (b) the use or occupancy of the Building in a limit of not less than One Million Dollars ($1,000,000) for injury to or death of one person in any one accident or occurrence and in an amount of not less than Two Million Dollars ($2,000,000) for injury to or death of more than one person in any one accident or occurrence.

STARBUCKS
REAL ESTATE

Landlord's Insurance shall be primary with respect to any claim arising out of events that occur outside the Premises.

**7.2.2   Property Insurance.** Commercial property form insurance insuring the Building (excluding any property which Tenant is obligated to insure under Section 7.1), against damage and destruction by fire, vandalism, and other perils in the amount of the full replacement value of the Building, as such value may exist from time to time.

**7.3   Waiver of Subrogation.** Neither Landlord nor Tenant shall be liable to the other or to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage to any building, structure or other tangible property, or any resulting loss of income and benefits, even though such loss or damage might have been occasioned by the negligence of such party, its agents or employees if any such loss or damage is covered by insurance benefiting the party suffering such loss or damage or was required to be covered by insurance pursuant to this Lease. Landlord and Tenant shall require their respective insurance companies to include a standard waiver of subrogation provision in their respective policies.

**7.4   Indemnification by Tenant.** Tenant shall defend, indemnify, and hold Landlord and Landlord's agents, officers, directors, employees, and contractors harmless against and from any and all injuries, costs, expenses, liabilities, losses, damages, injunctions, suits, actions, fines, penalties, and demands of any kind or nature (including reasonable attorneys' fees) arising in connection with any and all third party claims arising out of (a) injuries occurring within the Premises; (b) any intentional acts or negligence of Tenant or Tenant's agents, employees, or contractors; (c) any breach or default in the performance of any obligation on Tenant's part to be performed under this Lease; or (d) the failure of any representation or warranty made by Tenant herein to be true when made. This indemnity does not include the intentional or negligent acts or omissions of Landlord or its agents, officers, contractors or employees. This indemnity shall survive termination of this Lease only as to claims arising out of events that occur prior to termination of the Lease.

**7.5   Indemnification by Landlord.** Landlord shall defend, indemnify, and hold Tenant and Tenant's agents, officers, directors, employees, and contractors harmless against and from any and all injuries, costs, expenses, liabilities, losses, damages, injunctions, suits, actions, fines, penalties, and demands of any kind or nature (including reasonable attorneys' fees) by or on behalf of any person, entity, or governmental authority occasioned by or arising out of (a) injuries occurring in the Common Areas or any other portion of the Building outside the Premises; (b) any intentional act, or negligence of Landlord or Landlord's agents, employees, or independent contractors; (c) any breach or default in the performance of any obligation on Landlord's part to be performed under this Lease; or (d) the failure of any representation or warranty made by Landlord herein to be true when made. This indemnity does not include the intentional or negligent acts or omissions of Tenant or its agents, officers, contractors or employees. This indemnity shall survive termination of this Lease only as to claims arising out of events that occur prior to termination of the Lease.

STARBUCKS
REAL ESTATE

8.    ENVIRONMENTAL LIABILITY.

8.1    Environmental Law.  The term "Environmental Law" means any federal, state, local law, statute, ordinance, regulation or order and all amendments thereto pertaining to health, industrial hygiene, environmental conditions or Hazardous Substances.

8.2    Hazardous Substance.  The term "Hazardous Substance" shall mean any hazardous or toxic substances, materials or wastes, or pollutants or contaminants as defined, listed or regulated by any Environmental Law or by common law decision including, without limitation, chlorinated solvents; petroleum products or by-products; asbestos; and polychlorinated biphenyl.

8.3    Landlord's Covenants.  Landlord warrants, represents, covenants and agrees as follows:

8.3.1    To the best of Landlord's knowledge, no Hazardous Substance has been released, discharged or disposed of on, under or about the Premises, the Building or the Property (or off-site of the Premises which might affect the Premises or the Building) by any entity, firm or person, or from any source whatsoever.

8.3.2    Landlord shall require each of its employees, agents, contractors, subcontractors, tenants, subtenants, or any other party over whom Landlord has supervision or control or right of the same to comply with all applicable Environmental Laws.

8.3.3    To the best of Landlord's knowledge, there are no underground storage tanks on the Premises, the Building or the Property, and no underground storage tanks have been removed from the Premises, the Building or the Property.  To the best of Landlord's knowledge, there is no asbestos or asbestos containing material in or on the Premises or the Building, and no asbestos or asbestos containing material has been removed from the Premises or the Building.  To the best of Landlord's knowledge, no facilities involving the manufacture or disposal of any Hazardous Substance or the use or storage of more than five hundred (500) gallons of any Hazardous Substance per year, including, without limitation, gasoline stations, automobile repair facilities, dry cleaners, photo developing laboratories, junkyards, landfills, waste treatment storage, disposal, processing or recycling facilities have been located on or adjacent to the Premises, the Building or the Property.

8.3.4    Landlord shall give prompt notice to Tenant of: (a) any proceeding or inquiry by any governmental authority with respect to the presence of any Hazardous Substance on the Premises or the Building (or off-site of the Premises that might affect the Premises) or related to any loss or injury that might result from any Hazardous Substance; (b) all claims made or threatened by any third party against Landlord or the Premises, the Building or the Property relating to any loss or injury resulting from any Hazardous Substance; and (c) Landlord's discovery of any occurrence or condition on the Premises, the Building or the Property (or off-site of the Premises that might affect the

STARBUCKS
REAL ESTATE

Premises) that could cause the Premises or any part thereof, to be subject to any restriction on occupancy or use of the Premises under any Environmental Law.

8.3.5   If any Hazardous Substance is deposited, released, stored, disposed, discovered or present in or on the Premises, the Building or the Property, Landlord, at Landlord's expense, shall (subject to Tenant's obligations set forth in Section 8.5.1) in a manner that complies with all applicable laws, rules, regulations and policies of any governmental body with jurisdiction over the same, remove, transport and dispose of such substances and perform all remediation and cleanup necessary or advisable to remediate any damage to persons, property or the environment as a result of the presence of such Hazardous Substances.  Landlord shall use its best efforts to minimize direct and indirect impact on Tenant during all activities related to remediation.  If any asbestos is discovered in the Premises during Tenant's inspection of the Premises or construction of its tenant improvements, then Landlord shall promptly remove the asbestos or cause it to be removed at Landlord's sole cost and expense.  If the removal delays the construction or installation of Tenant's improvements, then the Rent Commencement Date shall be extended for one (1) day for each day of delay.

8.4   Tenant's Use of Any Hazardous Substance.  The only Hazardous Substances Tenant may use in its operations are cleaning solvents.  Tenant will manage such use in accordance with the Environmental Laws.  Other than using the foregoing cleaning solvents, Tenant does not have direct or indirect responsibility for or authority to manage or control use, transportation, generation or disposal of any Hazardous Substance on the Premises, the Building or the Property.

8.5   Indemnities.

8.5.1   Tenant shall protect, indemnify, and hold harmless Landlord and Landlord's employees, agents, parents, and subsidiaries from and against any and all loss, damage, cost, expense, or liability (including attorneys' fees) and the costs of repairs and improvements necessary to return the Premises to the physical condition existing prior to undertaking any activity related to any Hazardous Substance ("Claims") directly arising out of or attributable to Tenant's or Tenant's agents, contractors, or employees use, manufacture, storage, release, or disposal of a Hazardous Substance on the Premises or the Building.  This indemnity shall survive the termination of this Lease.

8.5.2   Landlord shall protect, indemnify and hold harmless Tenant and its agents, officers, directors, contractors, employees, parents, subsidiaries, successors and assigns from and against any Claims directly or indirectly related to: (a) a violation of or responsibility under Environmental Laws except that if such Claims are directly related to Tenant's, or Tenant's agents, contractors or employees use, manufacture, storage, release or disposal of a Hazardous Substance on the Premises or the Building; or (b) a breach of any representation, warranty, covenant or agreement contained in this Article.  This indemnity shall survive the termination of this Lease.  In the event of any governmental or court order concerning Hazardous Substances on the Premises, the Building or the Property (not caused by Tenant) that precludes Tenant from reasonable operation of its business on the Premises,

**STARBUCKS
REAL ESTATE**

Tenant may cease operating and Rent and all other charges shall be abated. If such governmental or court order is not resolved within six (6) months, Tenant may terminate this Lease.

9.    DAMAGE OR DESTRUCTION.

9.1    Material Damage.  If the Premises or the Building is damaged or destroyed by fire or any casualty which cannot, despite diligent, good faith efforts be repaired or restored within one hundred eighty (180) days following the date on which such damage occurs, then Tenant may elect to terminate the Lease effective as of the date of such damage or destruction.  Within thirty (30) days after the date of such damage, the parties shall determine how long the repair and restoration will take.  After that determination has been made, Tenant shall have a period of thirty (30) days to terminate the Lease by giving written notice to Landlord.

9.2    Repair After Damage.  If Tenant does not give notice of Tenant's election to terminate as provided in Section 9.1, then Landlord shall, subject to the provisions of this Section, immediately commence and diligently pursue to completion the repair of such damage so that the Premises and the Building are restored to a condition of similar quality, character and utility for Tenant's purposes.  Notwithstanding anything contained herein to the contrary, if the Premises or the Building is not repaired and restored within one hundred eighty (180) days from the date of the damage, Tenant may cancel the Lease at any time before Landlord completes the repairs and delivers the restored Premises to Tenant.  If Tenant does not so terminate, Landlord shall continue to restore the Premises.  In the event of termination, Landlord shall return any prepaid Rent and other prepaid amounts to Tenant within thirty (30) days from the date of termination of the Lease.

9.3    Uninsured Damage.  If damage or destruction is caused by a peril not required to be insured against hereunder and for which insurance proceeds are not available, either Landlord or Tenant may terminate this Lease by thirty (30) days written notice to the other of its election so to do and the Lease shall be deemed to have terminated as of such date unless the other party agrees in writing to pay for such repairs or restoration.

9.4    Damage During Final Two Years.  If any structural damage or destruction occurs to the Premises during the last two (2) years of the Initial Term or any Extension Term and the portion of the cost to repair the damage that is not covered by insurance exceeds Fifteen Thousand Dollars ($15,000), either Landlord or Tenant may terminate the Lease upon giving the other party thirty (30) days written notice; provided, however, that if Landlord notifies Tenant that it wishes to terminate the Lease, then Tenant may, if it has not already done so, exercise its right to extend the term of the Lease under Section 2.4 whereupon Landlord's election to terminate shall be null and void.

9.5    Landlord's Right to Terminate.  If the Building is substantially damaged and Landlord decides to demolish the Building and not to replace it with a similar building or shopping center, then Landlord may terminate this Lease if it also terminates the leases of all other tenants in the Building.

STARBUCKS
REAL ESTATE

9.6     Abatement of Rent.   If Landlord is required to repair or restore the Premises and/or the Building under any provision of this Article and Tenant's use of the Premises is affected, then until Landlord completes such repair or restoration, Rent and all other charges payable by Tenant hereunder shall abate based on the degree of impact such damage and repairs have on Tenant's operations within the Premises as measured by the proportionate reduction in either (at Tenant's election) Tenant's sales volume or the number of Tenant's customers.

10.     PROPERTY TAXES.

10.1     Definition of "Real Property Taxes".   For purposes of this Lease, the phrase "Real Property Taxes" shall include general real estate taxes and assessments payable with respect to the Property that are imposed by any authority having the power to tax any legal or equitable interest of Landlord in the Property; provided, however, that assessments shall be prorated and divided into the maximum number of installments permitted by law and only the current portion shall be included in Real Property Taxes for any Lease Year. Notwithstanding the foregoing, Real Property Taxes shall not include (a) any inheritance, estate, succession, transfer, gift, franchise, or capital stock tax; (b) any income taxes arising out of or related to ownership and operation of income-producing real estate; (c) any excise taxes imposed upon Landlord based upon gross or net rentals or other income received by it; or (d) assessments for improvements completed prior to the Commencement Date.

10.2     Payment of Real Property Taxes.   As of the Commencement Date, Landlord represents and warrants that (a) Landlord has paid in full all currently due Real Property Taxes, and (b) Landlord shall pay when due all future Real Property Taxes. The tax parcel number of the Property is set forth on Exhibit A.   For each Lease Year, if the Premises are not assessed as a separate tax parcel then Tenant shall pay Landlord, as additional rent, Tenant's Pro Rata Share (as defined in Section 12.2 below) of Real Property Taxes in the manner set forth in Article 12.   If the Premises is assessed as a separate tax parcel, for each Lease Year Landlord shall provide Tenant with a copy of the tax statement and Tenant shall pay the Real Property Taxes for the Premises directly to the taxing authority prior to delinquency, provided that the invoice or statement is received at least thirty (30) days prior to such date.   Subject to making estimated payments pursuant to Article 12, Tenant shall pay Real Property Taxes only as such taxes become due and payable during the Term (as defined in Section 2.1), prorated for the first and last years of the Term.   Tenant shall have the right to challenge, at its sole expense, the Real Property Taxes and Landlord agrees to provide whatever assistance Tenant may reasonably require.   Upon the request of Tenant, and if required to preserve the right to challenge such taxes, Landlord will pay all Real Property Taxes under protest or in such other manner as will preserve the right to challenge such taxes.   Tenant may challenge Real Property Taxes if Tenant pays any protested amount to Landlord.   Landlord will reimburse Tenant for Tenant's Pro Rata Share of any refund of Real Property Taxes received as a result of any tax contest.

10.3     Personal Property Taxes.   Tenant shall pay, prior to delinquency, all personal property taxes assessed against Tenant directly and applicable to personal property located in the Premises.

STARBUCKS
REAL ESTATE

10.4   Proposition 13 Protection.   Notwithstanding anything contained herein to the contrary, if the Building or the Property is sold or transferred or if a "change of ownership" (as defined in California Revenue Code Sections 60 & 61) occurs and as a direct result of either the Real Property Taxes increase pursuant to a reassessment under the terms of Proposition 13, Tenant shall not be obligated to pay any portion of such increase becoming due during the Initial Term which results from the second or any subsequent such sale, transfer or change of ownership.

11.   UTILITIES.   Tenant shall pay for all water, gas and electricity used by Tenant during the Term, all of which shall be measured through proper and sufficient meters or submeters installed at Tenant's expense and maintained by Tenant at its option.  If any such services are not separately metered to Tenant, Tenant shall pay eighty-five percent (85%) of the charges for such services.  Landlord shall not charge Tenant a rate for any utility in excess of the rate Landlord pays the supplier of the service.  Tenant shall have the right to sufficient utilities and ventilation necessary to support its intended use of the Premises.

12.   TENANT'S PRO RATA SHARE OF COMMON AREA MAINTENANCE, INSURANCE AND TAXES.

12.1   General Definitions.  The terms "Landlord's Insurance" and "Real Property Taxes" shall have the meanings assigned in Sections 7.2 and 10.1 respectively.

12.2   Definition of Tenant's Pro Rata Share.  Tenant's Pro Rata Share shall be equal to eighty-five percent (85%) of all utility charges other than natural gas, Landlord's Insurance and Real Property Taxes, and shall be one hundred percent (100%) of charges for natural gas supplied to the Premises.  Either Landlord or Tenant, at its option and expense, may install electrical submeters and following installation of such a submeter, Landlord and Tenant shall pay for electricity based on their actual usage.

12.3   Tenant's Payment.  Commencing on the Rent Commencement Date, for each calendar year of the Term (prorated for any calendar year falling partially within the Term), Tenant shall pay to Landlord as additional rent Tenant's Pro Rata Share of Landlord's Insurance and Real Property Taxes (collectively known as "Annual Additional Rent").  Prior to the Rent Commencement Date and at least thirty (30) days prior to the beginning of each calendar year thereafter, Landlord shall furnish to Tenant a written statement setting forth the following: (a) the amount Landlord estimates Landlord will pay for Real Property Taxes and Landlord's Insurance for the then upcoming calendar year; (b) Landlord's estimate of Tenant's Annual Additional Rent; and (c) a calculation of one-twelfth (1/12) of Landlord's estimate of Tenant's Annual Additional Rent ("Monthly Estimated Rent").  Tenant shall pay to Landlord the Monthly Estimated Rent beginning on the Rent Commencement Date and on the first day of every successive calendar month thereafter during the Term.  Monthly Estimated Rent for a period of less than one month shall be prorated on a daily basis based on a three hundred sixty-five (365) day year.

12.4   Reconciliation.  For each calendar year of the Term, Landlord shall furnish to Tenant, within sixty (60) days after the end of each calendar year, a statement in

STARBUCKS
REAL ESTATE

reasonable detail, including supportive documentation, setting forth (a) Landlord's actual costs for Real Property Taxes and Landlord's Insurance for that year by category and amount; (b) the amount of Tenant's Annual Additional Rent; and (c) the sum of Tenant's Monthly Estimated Rent payments made during the year. If the amount of Tenant's Annual Additional Rent exceeds the sum of Tenant's Monthly Estimated Rent payments, Tenant shall pay the deficiency to Landlord within forty-five (45) days after Tenant's receipt of such statement. If the sum of Tenant's Monthly Estimated Rent payments during the year exceeds the amount of Tenant's Annual Additional Rent, Landlord shall pay the excess to Tenant at the time Landlord furnishes the statement, or, if the Term has not expired, may credit the excess toward the payments of Rent and Tenant's Monthly Estimated Rent next falling due.

12.5    Records.   Landlord shall keep records showing all expenditures incurred as Landlord's Insurance and Real Property Taxes for each calendar year for a period of three (3) years following each year, and such records shall be made available for inspection by Tenant and/or its agents during ordinary business hours in the city in which the Premises is located.

12.6    Dispute Resolution.   Any dispute with respect to Landlord's calculations of Tenant's Annual Additional Rent shall be resolved by the parties through consultation in good faith within sixty (60) days. However, if the dispute cannot be resolved within such period, the parties shall request an audit of the disputed matter from an independent, certified public accountant selected by both Landlord and Tenant, whose decision shall be based on generally accepted accounting principles and shall be final and binding on the parties. If there is a variance of three percent (3%) or more between said decision and the Landlord's determination of Tenant's Annual Additional Rent, Landlord shall pay the costs of said audit and shall credit any overpayment toward the next Rent and/or Monthly Estimated Rent payment falling due or pay such overpayment to Tenant within thirty (30) days. If the variance is less than three percent (3%), Tenant shall pay the cost of said audit.

13.    ASSIGNMENT AND SUBLETTING.   Tenant shall not assign this Lease and shall not let or sublet the whole or any portion of the Premises without the written consent of Landlord, which consent shall not be unreasonably withheld, conditioned, or delayed. Landlord shall be reimbursed by Tenant for reasonable legal and accounting fees, not to exceed $2,500 in the aggregate, incurred in Landlord's determination of the suitability of any proposed subtenant or assignee. Notwithstanding the foregoing, Tenant may, without Landlord's consent, sublet all or any portion of the Premises or assign the Lease to: (a) a parent, subsidiary, affiliate, division or corporation controlling, controlled by or under common control with Tenant; (b) a successor corporation related to Tenant by merger, consolidation, reorganization or government action; or (c) a purchaser of substantially all of Tenant's tangible property in the Premises, provided that, as of the date of such transfer, the purchaser reasonably has a net worth of One Million Five Hundred Thousand Dollars ($1,500,000) or more as of the end of its most recent fiscal year and the legal ability to perform Tenant's obligations under this Lease. For the purpose of this Lease, any sale or transfer of Tenant's capital stock, redemption or issuance of additional stock of any class shall not be deemed an assignment, subletting or any other transfer of the Lease or the

STARBUCKS
REAL ESTATE

Premises. Landlord shall not be entitled to any consideration in connection with any assignment or sublet. If Landlord's consent is required for an assignment or sublease, then Landlord's consent shall be deemed to have been given unless Landlord notifies Tenant in writing of the reasons for Landlord's disapproval within fourteen (14) days of receipt of the request. Unless released in writing, Tenant shall remain secondarily liable under the Lease following any assignment or sublease other than a Permitted Transfer; provided, however, that Tenant's obligations may not be enlarged or extended by any act or agreement of any assignee or subtenant. The assigning party's liability under the Lease shall terminate automatically if the Landlord fails to provide such party with a copy of all default notices to the assignee or subtenant.

14.    DEFAULTS; REMEDIES.

14.1    Tenant's Defaults. The occurrence of any one or more of the following events shall constitute a default and breach of this Lease by Tenant:

(a)  The failure by Tenant to make any payment of Rent or any other payment required to be made by Tenant hereunder, as and when due, where such failure shall continue for a period of ten (10) calendar days after Landlord notifies Tenant in writing of such failure; or

(b)  The failure by Tenant to observe or perform any of the covenants, conditions, or provisions of this Lease to be observed or performed by Tenant, other than the payment of sums due hereunder, where such failure shall continue for a period of thirty (30) days after written notice thereof from Landlord to Tenant; provided, however, that if the nature of Tenant's default is such that more than thirty (30) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant commences such cure within such thirty (30) day period and thereafter diligently pursues such cure to completion.

14.2    Remedies in Default. In the event of any such uncured default, Landlord may, in accordance with procedures required by law, pursue one of the following remedies:

(a)  Landlord may terminate Tenant's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Tenant shall surrender possession of the Premises to Landlord within thirty (30) days after written notice from Landlord to Tenant. In such event, Landlord shall be entitled to recover from Tenant all damages incurred by Landlord by reason of Tenant's default including, but not limited to, the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises for uses similar to Tenant's uses, and the Rent and Additional Rent as it becomes due hereunder. If Landlord relets the Premises, then any rent or other concessions given to the new tenant shall be prorated evenly throughout the entire term of the new lease; or

(b)  Landlord may maintain Tenant's right to possession, in which case this Lease shall continue in effect whether or not Tenant shall have abandoned the Premises.

STARBUCKS
REAL ESTATE

In such event, Landlord shall be entitled to enforce all of Landlord's rights and remedies under this Lease including the right to recover the Rent and Additional Rent as it becomes due hereunder.

With respect to any remedy exercised by Landlord, Landlord shall have an affirmative obligation to obtain another tenant for the Premises at a fair market rental and to otherwise mitigate its damages.

14.3    Landlord Defaults and Remedies.  The occurrence of any one or more of the following events shall constitute a default and breach of this Lease by Landlord:  (a) Landlord's failure to do, observe, keep and perform any of the terms, covenants, conditions, agreements or provisions of this Lease required to be done, observed, kept or performed by Landlord, within thirty (30) days after written notice by Tenant to Landlord of said failure (except when the nature of Landlord's obligation is such that more than thirty (30) days are required for its performance, then Landlord shall not be deemed in default if it commences performance within the thirty (30) day period and thereafter diligently pursues the cure to completion); or (b) the failure of any representation or warranty to be true when deemed given hereunder.  In the event of a default by Landlord, Tenant, at its option, without further notice or demand, shall have the right to any one or more of the following remedies in addition to all other rights and remedies provided at law or in equity or elsewhere herein: (a) to remedy such default or breach and deduct the costs thereof from the installments of Rent and Additional Rent next falling due; (b) to pursue the remedy of specific performance; and (c) to terminate the Lease.  Nothing herein contained shall relieve Landlord from its obligations hereunder, nor shall this Section be construed to obligate Tenant to perform Landlord's repair obligations.

15.    CONDEMNATION.

15.1    Condemnation of Premises.  If any portion of the Premises is taken under the power of eminent domain, or sold by Landlord under the threat of the exercise of said power (the act of which is herein referred to as "condemnation"), this Lease shall terminate as to the part so taken as of the date the condemning authority takes possession of the condemned portion of the Premises (the "Condemnation Date ").  If the entire Premises is condemned, then the Lease shall automatically terminate as of the Condemnation Date.  The party who receives the condemnor's notice of intention to take (the "Condemnation Notice") shall immediately give a copy of such notice to the other party.

15.2    Condemnation of the Property.  If as a result of any condemnation of the Property or any portion thereof (even though the Premises is not physically affected) the Premises is no longer reasonably suited for the conduct of Tenant's usual business in Tenant's reasonable business judgment, then Tenant may terminate this Lease at any time after Tenant receives the Condemnation Notice by giving Landlord thirty (30) days written notice.

15.3    Condemnation of the Building.  If a condemnation of any portion of the Building (even though the Premises is not physically affected) renders the Building unsuitable

STARBUCKS
REAL ESTATE

for use as a retail building in either party's reasonable business judgment, then either Landlord or Tenant may terminate this Lease by giving the other at least thirty (30) days written notice. Notwithstanding the foregoing, Landlord may only exercise its right to terminate under this Section if Landlord terminates the leases of all other tenants in the Building.

15.4   Restoration.   If this Lease is not terminated as to the whole Premises, (a) it shall remain in full force and effect as to the portion of the Premises remaining, provided the Rent and all other charges payable hereunder shall be reduced in the same proportion that the area taken bears to the total area of the Premises prior to taking, and (b) Landlord shall use the condemnation award to restore the Premises and the Building as soon as reasonably possible to a complete unit of the same quality, character and utility for Tenant's purposes existing prior to the condemnation. Notwithstanding anything contained herein to the contrary, if the restoration of the Premises and/or the Building is not commenced within thirty (30) days of Landlord's receipt of the condemnation award or is not completed within one hundred eighty (180) days from the Condemnation Date, then Tenant may cancel the Lease at any time before Landlord completes the restoration. If this Lease is terminated, Landlord shall return any deposits, all prepaid Rent and other prepaid sums to Tenant within thirty (30) days of the date of termination of the Lease.

15.5   Award.   Landlord and Tenant may each pursue any condemnation award to which it is entitled by applicable law. Tenant may recover from the condemning authority or from Landlord (if Tenant can show that such amount was included in Landlord's award) that portion of any net award or payment attributable to Tenant's Property, including without limitation, the unamortized value of improvements installed in the Premises by Tenant at Tenant's expense based on straight-line depreciation over the Initial Term of the Lease without regard to the condemnation. For the purposes of this Section, a "net" award or payment shall mean the entire award or payment for such taking, less the actual and reasonable expenses incurred in collecting such award or payment.

16.   SIGNAGE.   Tenant, at its cost, shall have the right to install or place signs, awnings, or other advertising materials in or about the Premises or on the Building to the maximum extent permitted by law; provided that Tenant obtains Landlord's consent (a) as to the method of attaching signs that will be permanently attached to the exterior of the Building; (b) for any awnings; and (c) for the location and design of any pylon signs. Landlord shall not unreasonably withhold, condition or delay its consent. Tenant shall submit plans and specifications for its exterior signs and awnings to Landlord for approval prior to submitting the plans and specifications to the local authorities for permitting. Landlord shall be deemed to have consented to such proposed signs and awnings unless Landlord notifies Tenant in writing of its specific objections within fourteen (14) days of receiving such proposal. All signs and awnings shall be in compliance with all applicable laws, regulations and rules. Notwithstanding anything contained herein to the contrary, Tenant shall not be required to obtain Landlord's consent for any promotional or advertising signs or displays within the interior of the Premises. Landlord shall not allow any signage other than Tenant's to be erected on the exterior walls of the Premises or on the face of the Building or on the roof above the Premises.

STARBUCKS
REAL ESTATE

17.   PERMIT CONTINGENCY.  Tenant's obligations under this Lease are conditioned on Tenant's obtaining, within one hundred twenty (120) days of the mutual execution and delivery of this Lease, any permits and/or licenses (including but not limited to conditional use permits, building permits and variances) that are required by applicable laws to enable Tenant legally to (a) construct Tenant's improvements to the Premises in accordance with the Plans; (b) to install Tenant's signage on the Premises; (c) to conduct its business from the Premises; and (d) for outdoor seating.  Tenant shall, at Tenant's expense, initiate and diligently pursue each permit and/or license.  Landlord shall execute any applications and shall provide Tenant with such further assistance and cooperation as Tenant may require in connection with applications for such permits and licenses.  If Tenant does not obtain such permits and licenses on terms satisfactory to Tenant within such period or if a permit and/or license is not renewed or is revoked during the term of this Lease due to Landlord's actions, Tenant shall have the right to terminate this Lease.  Thereafter, neither party shall have any rights or liabilities under the Lease, and Landlord shall return any deposits and prepaid amounts to Tenant, if any.  Tenant shall vacate the Premises within thirty (30) days after exercising the option to terminate as herein provided.

18.   OUTDOOR SEATING.  If such seating is permitted by the local authorities, Tenant may provide outdoor seating for its customers on property owned by Landlord adjacent to the Premises at any time during the Term of this Lease at no additional rental. Tenant, at its cost, shall comply with all relevant state, municipal or local laws, regulations, rules or ordinances with respect to outdoor seating, and obtain all necessary permits or licenses for the same.  Tenant shall maintain the outdoor seating area exclusively serving its customers in a reasonably clean and neat fashion.

19.   TENANT'S RIGHT OF EARLY TERMINATION.  Notwithstanding anything contained herein to the contrary, Tenant, in its sole discretion, shall have the right to terminate the Lease any time on or after the last day of the third (3rd) full Lease Year (the "Early Termination Date").  In order to exercise this early termination right, Tenant must (a) give Landlord written notice at least one hundred twenty (120) days before the Early Termination Date and may not give such notice prior to the time the Tenant has paid Rent for three (3) Lease Years and (b) shall forfeit the right to return of the security deposit as provided in Section 3.3 and shall pay to Landlord an amount equal to the amount, if any, that has been applied to rent due in months 57 through 60 as set forth in Section 3.3.  Upon the date Tenant specifies for such early termination, Tenant shall be fully and forever released and discharged from any and all obligations, covenants or liabilities of whatsoever kind or nature in law or equity or otherwise arising out of or in connection with the Lease or any other agreements by and between Landlord and Tenant except any obligation or liability accrued before the Early Termination Date.

20.   USE OF COMMON AREAS.  Tenant and Landlord shall each have the nonexclusive right to use any and all appurtenances and easements benefiting the Premises and the Building, along with sufficient Common Areas to support its intended use of the Premises.  In addition to the foregoing, Tenant shall have the right of access to such portions of the Building outside the Premises as are necessary to enable Tenant to exercise its rights under this Lease.  Any changes, additions or alterations to the Premises, the Property or the

24663\101\00001.LSE/12.13.95
Seattle

19

**STARBUCKS
REAL ESTATE**

Building shall not (a) impair access to, visibility of or frontage of the Premises; (b) materially affect the conduct of Tenant's customary business therein; or (c) detract from Tenant's signage, create confusion regarding the business conducted in the Premises, or adversely affect the presentation of Tenant's exterior signage and storefront. In the event of any such interference, the Rent shall be equitably abated based on the degree of interference with Tenant's business.

21. ACCESS. Neither Landlord nor Tenant shall vary or permit to be varied the existing means of ingress and egress to the Building and the Property. Tenant shall assist in maintaining the security of the Landlord's facilities in the basement of the Building by keeping the rear gate locked, except as required for the Tenant's use and enjoyment of the Premises; provided, Tenant shall have no liability or responsibility to Landlord or any other person if it shall fail for any reason in keeping such gate locked.

22. TRASH REMOVAL. Landlord shall provide a location on the Property convenient to the Premises for a three or four cubic-yard trash container and recycling bins for trash disposal and recycling exclusively for Tenant's use. Tenant shall pay all costs for disposal of Tenant's trash land Landlord shall pay all costs for disposal of Landlord's trash.

23. GENERAL PROVISIONS.

23.1 Estoppel Certificate. Tenant shall, no more than twice in any Lease Year and upon not less than twenty (20) days prior written notice from Landlord, execute, acknowledge and deliver to any prospective purchaser or mortgagee, or to Landlord on such party's behalf a statement in writing on Tenant's standard form or on such other form as is acceptable to Tenant, (a) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect); (b) stating the date to which the Rent and other charges are paid and the amount of any security deposit held by Landlord, if any; and (c) acknowledging that there are not, to the actual knowledge of the person executing such certificate, any uncured defaults on the part of Landlord hereunder, or specifying such defaults, if any, which are claimed. Any such statement may be conclusively relied upon by any prospective purchaser or encumbrancer of the Premises. Such certificates shall not affect, prejudice or waive any rights or remedies of Tenant against Landlord.

23.2 Landlord's Interests. Landlord represents and warrants to Tenant that as of the Commencement Date, (a) Landlord owns and holds fee title in and to the Building, the Premises and the Property; (b) the real property identified on Exhibit A contains the Premises described in Section 1; and (c) there are no encumbrances, liens, agreements, covenants in effect that would limit Tenant's rights hereunder. The term "Landlord" as used herein shall mean only the owner or owners, at the time in question, of the fee title (or a tenant's interest in a ground lease) of the Premises. In the event of an assignment or transfer of this Lease by Landlord for other than security purposes, Landlord shall cause its assignee or transferee to assume the provisions of this Lease and Landlord shall deliver notice of such assignment or transfer and a copy of the effective instrument of transfer to Tenant within fifteen (15) days after the date of transfer. Tenant shall be entitled to continue to pay rent

STARBUCKS
REAL ESTATE

and give all notices to Landlord until Tenant has received the foregoing from Landlord. Landlord shall deliver all funds in which Tenant has an interest, including but not limited to Tenant's security deposit, if any, to Landlord's purchaser or assignee. From and after a sale of the Premises or the Building, Landlord shall be released from all liability toward Tenant arising from this Lease because of any act, occurrence or omission of Landlord's successors occurring after the transfer of Landlord's interest in this Lease, provided Landlord's purchaser or assignee expressly assumes Landlord's duties and covenants under this Lease. Nothing herein shall be deemed to relieve Landlord of any liability for its acts, omissions or obligations occurring or accruing up to and including the date of such transfer.

23.3   Authority.  Each of Landlord and Tenant hereby represents and warrants that this Lease has been duly authorized, executed and delivered by and on its behalf and constitutes such party's valid and binding agreement in accordance with the terms hereof.

23.4   Severability.  The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

23.5   Time of Essence.  Time is of the essence to the parties executing this Lease.

23.6   Headings.  Article and section headings are not a part hereof and shall not be used to interpret the meaning of this Lease.

23.7   Incorporation of Prior Agreements: Amendments.  This Lease contains all agreements of the parties as of the date hereof with respect to any matter mentioned herein. No prior agreement, correspondence or understanding pertaining to any such matter shall be effective to interpret or modify the terms hereof. This Lease may be modified only in writing, signed by the parties in interest, at the time of the modification. Landlord specifically acknowledges that Tenant's employees at the Premises do not have authority to modify the Lease or to waive Tenant's rights hereunder.

23.8   Waivers.  No waiver by Landlord or Tenant of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by Tenant or Landlord of the same or any other provision. A party's consent to or approval of any act shall not be deemed to render unnecessary obtaining such party's consent to or approval of any subsequent act. No waiver shall be effective unless it is in writing, executed on behalf of Landlord or Tenant by the person to whom notices are to be addressed.

23.9   Recording.  Landlord or Tenant may record a short form or memorandum of Lease at its own expense. At Tenant's request, the parties shall execute a memorandum of Lease in recordable form giving notice of such nonmonetary terms as Tenant may reasonably request, including Tenant's exclusivity and option rights. If Tenant exercises such option, upon termination or expiration of the Lease, Tenant shall, at its sole expense, remove such recorded memorandum from title records.

STARBUCKS
REAL ESTATE

23.10  Holding Over.  If Tenant remains in possession of the Premises or any part thereof after the expiration of the Term, with or without the consent of Landlord, such occupancy shall be a tenancy from month-to-month at a rental in the amount of the Rent payable in the last month of the Term, plus all other charges payable hereunder, and upon the terms hereof applicable to month-to-month tenancies.

23.11  Cumulative Remedies.  Except where otherwise expressly provided in this lease, no remedy or election hereunder shall be deemed exclusive, but shall, wherever possible, be cumulative with all other remedies at law or in equity.

23.12  Binding Effect; Choice of Law.  The Lease shall be binding upon and benefit the parties, their personal representatives, successors and assigns.  The Lease shall be governed by the laws of the state where the Premises is located.

23.13  Subordination, Nondisturbance and Attornment.  This Lease shall be subordinate to all existing and future mortgages and/or deeds of trust on the Premises, the Building or the Property, and Tenant agrees to subordinate this lease to any future mortgage of deed of trust and to attorn to Landlord's successor following any foreclosure, sale or transfer in lieu thereof; provided that the mortgagee, transferee, purchaser, lessor or beneficiary ("Landlord's Successor") agrees in a written instrument in form and substance satisfactory to Tenant that Tenant's use or possession of the Premises shall not be disturbed, nor shall its obligations be enlarged or its rights be abridged hereunder by reason of any such transaction.  Notwithstanding any foreclosure or sale under any mortgage or deed of trust (or transfer by deed in lieu thereof), this Lease shall remain in full force and effect.

23.14  Landlord's Access.  Landlord and Landlord's agents shall have the right to enter the Premises upon reasonable prior written notice for the purpose of inspecting the same, showing the same to prospective purchasers or lenders, and making such alterations, repairs, improvements or additions to the Premises or to the Building as Landlord deems necessary or desirable.  Notwithstanding the foregoing, in the event of an emergency requiring Landlord's entry into the Premises, Landlord may give Tenant shorter notice in any manner that is practicable under the circumstances.  Landlord may, at any time, place on or about the Premises ordinary "For Sale" signs, and Landlord may at any time during the last sixty (60) days of the Term, place on or about the Premises ordinary "For Lease" signs, in either case, so long as such signs do not detract from Tenant's use of the Premises.  Any such sign shall be no larger than two feet by two feet (2' x 2').  When entering or performing any repair or other work in the Premises, Landlord, its agents, employees and/or contractors (a) shall identify themselves to Tenant's personnel immediately upon entering the Premises, and (b) shall not, in any way, materially or unreasonably affect, interrupt or interfere with Tenant's use, business or operations on the Premises or obstruct the visibility of or access to the Premises.  In the event of substantial, material or unreasonable interference, the Rent and additional rent all shall be equitably abated if the interference continues for more than twenty four (24) hours.  In the event such interference shall continue for longer than six (6) months, Tenant shall have the option to terminate the Lease or continue to operate with rent abatement after such interruption has ceased for a time period equal to the time period of such interruption.

STARBUCKS
REAL ESTATE

23.15  Only Landlord/Tenant Relationship.  Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, partnership, joint venturer or any association between Landlord and Tenant.  Landlord and Tenant expressly agree that neither the method of computation of rent nor any act of the parties hereto shall be deemed to create any relationship between Landlord and Tenant other than the relationship of Landlord and Tenant.

23.16  Attorneys' Fees.  If either party brings an action or proceeding to enforce the terms hereof or declare rights hereunder, the prevailing party in any such action, proceeding, trial or appeal, shall be entitled to its reasonable attorneys' fees to be paid by the losing party as fixed by the court.

23.17  Force Majeure.  In the event that either party shall be delayed or hindered in or prevented from the performance of any covenant, agreement, work, service, or other act required under this Lease to be performed by such party, and such delay or hindrance is due to causes entirely beyond its control such as riots, insurrections, martial law, civil commotion, war, fire, flood, earthquake, or other casualty or acts of God, the performance of such covenant, agreement, work, service, or other act shall be excused for the period of delay and the time period for performance shall be extended by the same number of days in the period of delay.

23.18  Confidentiality of Lease.  From and after the date lease negotiations were entered into and throughout the Term of this Lease, the parties shall not disclose any of the terms, covenants, conditions or agreements set forth in this Lease or any amendments hereto, nor provide this Lease, any amendments hereto or any copies of either of the same to any person including, without limitation, any brokers.  Landlord hereby acknowledges that the disclosure of any of the terms, covenants, conditions and agreements set forth in this Lease, or any amendment hereto, to any third party would cause material damage to Tenant. Notwithstanding the foregoing, Landlord may disclose the terms of this Lease to any current or potential mortgagee or purchaser of the Property who agrees to be bound by the terms of this Section.

23.19  Brokers.  Landlord agrees to pay a brokerage commission to JHR Properties and James H. Roberts, and Tenant agrees to pay a brokerage commission to Epstein & Associates and Staci Eisler, in each case for services provided in connection with this Lease.  Except as specifically identified in this Section, Landlord and Tenant each represent to the other that they have not dealt, directly or indirectly, in connection with the leasing of the Premises, with any other broker or person entitled to claim a commission or leasing fees.  Landlord and Tenant each shall indemnify and hold each other harmless from any loss, liability, damage, or expense (including without limitation reasonable attorneys' fees) arising from any claim for a commission or leasing fee arising out of this transaction made by any unidentified broker or other person with whom such party has dealt.

**STARBUCKS
REAL ESTATE**

23.20  Consents.  Whenever the right of approval or consent is given to a party pursuant to this Lease, that party shall not unreasonably withhold, condition or delay its consent unless this Lease expressly provides otherwise.

24.  QUIET ENJOYMENT.  Without limiting any rights Tenant may have by statute or common law, Landlord covenants and agrees that, so long as this Lease is in full force and effect, Tenant shall lawfully and quietly hold, occupy and enjoy the Premises during the Term of this Lease without disturbance by Landlord or by any person having title paramount to Landlord's title or by any person claiming through or under Landlord.

25.  NOTICES.  Whenever a provision is made under this Lease for any demand, notice or declaration of any kind, or where it is deemed desirable or necessary by either party to give or serve any such notice, demand or declaration to the other party, it shall be in writing and served either personally or sent by United States mail, certified, postage prepaid, addressed at the addresses set forth below or at such address as either party may advise the other from time to time.

| | |
|---|---|
| To Landlord at: | Mr. Heinz P. Gross |
| | 1335 Pacific Avenue |
| | Santa Cruz, CA  95060 |
| | |
| To Tenant at: | Starbucks Corporation |
| | Attn:  Property Management Department |
| | Mailstop  S-RE3 |
| | |
| by mail at: | P.O. Box 34067 |
| | Seattle, WA  98124-1067 |
| | |
| or by overnight delivery to: | 2401 Utah Avenue South |
| | Seattle, WA  98134 |

Landlord shall send a duplicate copy of any notice given under Article 14 to the attention of the Law and Corporate Affairs Department at the same address.

Notices given hereunder shall be deemed to have been given on the date of personal delivery (or the first business day thereafter if delivered on a non-business day) or two (2) days after the date of mailing.

STARBUCKS
REAL ESTATE

26.    NO RELIANCE ON BROKER.. The parties to this Lease agree they have thoroughly read the Lease and completely understand each term and provision therein. The parties hereby agree that, at the time this Lease is executed, the terms and conditions of this Lease are commercially reasonable and effectuate the intent and purpose of Landlord and Tenant with respect to the Premises.

Landlord and Tenant agree no representation or recommendation have been made by James H. Roberts, Broker, JHR Properties, or its agents or employees, as to the legal sufficiency, legal effect or tax consequences of this Lease or any transaction relating thereto.

27.    EXHIBITS.  The following exhibits are attached to this Lease and by this reference are incorporated herein:

Exhibit A - Legal Description
Exhibit B - Delivery of Possession

IN WITNESS WHEREOF, the parties have executed this Lease as of the date first above written.

LANDLORD:                                TENANT:

                                         STARBUCKS CORPORATION,
                                         a Washington corporation

                                         By

HEINZ P. GROSS, individually and as Trustor     Howard Schultz
and Trustee of The Heinz Gross Living Trust     Chairman and Chief Executive Officer
dated November 9, 1995

Landlord's Federal Tax Identification
Number:  882 36 7520

STARBUCKS
REAL ESTATE

STATE OF CALIFORNIA          )
                             ) ss.
COUNTY OF SANTA CRUZ         )

On this 19TH day of December, 1995, personally appeared HEINZ P. GROSS, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____                    (Seal)

STATE OF WASHINGTON          )
                             ) ss.
COUNTY OF KING               )

On this 15 day of December, 1995, before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared HOWARD SCHULTZ, to me known to be the chairman and chief executive officer of STARBUCKS CORPORATION, a Washington corporation, the corporation that executed the foregoing instrument and acknowledged the said instrument to be the free and voluntary act and deed of said corporation for the uses and purposes therein mentioned, and on oath stated that he is authorized to execute said instrument.

WITNESS my hand and official seal hereto affixed the day and year this certificate above written.

NOTARY PUBLIC, in and for the State of Washington,
residing at _____
Commission expires: _____
Print Name: _____

STARBUCKS
REAL ESTATE

. EXHIBIT A

LEGAL DESCRIPTION

Tax Parcel Number:  005-076-10

That certain tract of land situated in the City of Santa Cruz, County of Santa Cruz, State of California, commonly known as 1335 Pacific Avenue, Santa Cruz, California, and described as follows:

> Beginning on the Westerly wall line of Pacific Avenue as widened, at the Northeasterly corner of Lot of Henrietta C. Kunitz as recorded in Volume 121 of Deeds, page 248, Santa Cruz County Records; thence along said Westerly wall line of Pacific Avenue North 13°40' West 21 feet 3 inches to the Southeasterly corner of land of A.G. Bowman, as recorded in Volume 240 of Deeds, page 10, Santa Cruz County Records; thence leaving said Avenue and along the South line of said Bowman lot South 76°01' West 112 feet; thence South 13°41' East 21 feet 3 inches to the Northwesterly corner of said Lot of Henrietta C. Kunitz; thence along the Northerly line of said Kunitz lot North 76°01' East 112 feet to the point of beginning.

STARBUCKS
REAL ESTATE

EXHIBIT B

DELIVERY OF POSSESSION

Project Name: _____ Store #: _____

Date Possession Tendered: _____

Tenant:  Starbucks Corporation

Landlord: _____

Premises Address: _____

Square Footage: _____

Landlord and Tenant acknowledge and agree that the Premises was tendered to Tenant on the Possession Date noted above.

_____ Landlord's Work is complete and accepted by Tenant, subject to the terms and conditions of the Lease regarding latent defects and completion of punchlist items.

_____ Although the items of Landlord's Work indicated below are not complete, Tenant hereby accepts possession of the Premises and elects to complete the unfinished items at Landlord's expense, subject to the terms and conditions of the Lease.

_____ Tenant hereby refuses possession of the Premises because the items of Landlord's Work indicated below are not complete.

Incomplete items of Landlord's Work: _____

_____

[Attach additional pages if needed]

From and after the date hereof, all notices should be delivered to Tenant at the address set forth in Section 25 of the Lease.


Landlord:                                   Tenant:


_____            _____
Print Name: _____            Print Name: _____
Title: _____            Title:  Construction Manager
Date: _____            Date: _____

24663\101\00001.LSE/12.13.95
Seattle

1

STARBUCKS
REAL ESTATE

## SECOND AMENDMENT TO
## COMMERCIAL LEASE

THIS SECOND AMENDMENT TO COMMERCIAL LEASE ("Amendment") is made this 29 day of January , 2013 (the "Effective Date," which shall be the date of full execution by both parties), by and between Heinz P. Gross OR Ursula M. Scholz-Gross. ("Landlord") and Starbucks Corporation, a Washington corporation ("Tenant"). Landlord and Tenant are sometimes hereinafter referred to as the "Parties" collectively or a "Party" individually.

### RECITALS

This Amendment is made with reference to the following facts:

A.     The Parties entered into that certain Commercial Lease dated in or around December 1995, as amended by that certain First Amendment to Commercial Lease dated August 9, 2010 (collectively, hereinafter referred to as the "Lease"), covering certain commercial property located at 1335 Pacific Avenue, Santa Cruz, California (the "Premises").

B.     Currently, the Term of the Lease is set to expire on April 30, 2016 and one (1) five (5) year renewal option to extend the Term of the Lease remains.

C.     The Parties now wish to amend the Lease upon the terms, covenants and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the mutual covenants, promises and conditions hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, as of the Effective Date the Parties agree as follows:

### AGREEMENT

1.  .   Recitals.  The above Recitals are incorporated herein by reference.

2.     Term.  The Parties hereby extend the term of the Lease for an additional ten (10) year period commencing on May 1, 2016 (immediately and automatically upon the expiration of the Term of the Lease on April 30, 2016 ) and expiring April 30, 2026 (the "Extended Term"), upon the same terms and conditions as set forth in the Lease unless otherwise modified herein. Base Rent with respect to the Extended Term shall be as set forth in Paragraph 4 below,

3.     Extension.  Landlord and Tenant acknowledge and agree that, as of the Effective Date of this Amendment, Tenant shall continue to have the option to extend the Term of the Lease for one (1) consecutive five (5) year period (the "Extension Term"), upon the same terms and conditions as set forth in the Lease unless otherwise modified

1

5241-Santa Cruz

STARBUCKS

herein. Base Rent with respect to the extension term, if said option is exercised by Tenant, shall be as set forth in Paragraph 4 below.  Landlord and Tenant acknowledge and agree that, as of the Effective Date of this Amendment, one (1) five (5) year renewal option to extend the Term of the Lease remains.

4.    Base Rent.  Section 3.1 of the Lease is hereby amended to specify the following as Base Rent payments for the periods outlined below:

| Lease Years | Monthly Installment | Annual Rent |
|---|---|---|
| **Extended Term:** | | |
| 21 | | |
| 5/1/2016 – 4/30/2017 | $4,851.70 | $58,220.45 |
| 22 | | |
| 5/1/2017 – 4/30/2018 | $4,997.26 | $59,967.06 |
| 23 | | |
| 5/1/2018 – 4/30/2019 | $5,147.17 | $61,776.07 |
| 24 | | |
| 5/1/2019 – 4/30/2020 | $5,301.59 | $63,619.06 |
| 25 | | |
| 5/1/2020 – 4/30/2021 | $5,460.64 | $65,527.63 |
| 26 | | |
| 5/1/2021 – 4/30/2022 | $6,006.70 | $72,080.39 |
| 27 | | |
| 5/1/2022 – 4/30/2023 | $6,186.90 | $74,242.80 |
| 28 | | |
| 5/1/2023 – 4/30/2024 | $6,372.51 | $76,470.09 |
| 29 | | |
| 5/1/2024 – 4/30/2025 | $6,563.68 | $78,764.19 |
| 30 | | |
| 5/1/2025 – 4/30/2026 | $6,760.59 | $81,127.11 |
| **Extension Term Option:** | | |
| 31-35 | "Fair Market Rent" | |
| 5/1/2026 – 4/30/2031 | as defined in Section 5 of the First Amendment | |

5.    Notices.  As of the Effective Date of this Amendment, Section 25 of the Lease is hereby amended and the following paragraph is added to the end of that section:

"Notwithstanding anything to the contrary in the Lease, notices given hereunder shall be deemed to have been given on the date of personal

2

5241-Santa Cruz

STARBUCKS

delivery (or the first business day thereafter if delivered on a non-business day), or five (5) business days after the date of notice sent via certified mail, or the second business day after notice sent by way of overnight courier, all of which forms of notice the parties acknowledge and agree shall be effective manners of delivery of notices under this Lease."

6..   <u>Miscellaneous</u>.

6.1   <u>Capitalized Terms/Definitions</u>. Each capitalized term used in this Amendment and not defined herein shall be deemed to have the same meaning ascribed to it in the Lease.

6.2   <u>Continuing Effect</u>. Except as specifically provided in this Amendment, the provisions of the Lease shall remain unchanged and in full force and effect. In the event of a conflict between the Lease and this Amendment, this Amendment shall control.

6.3   <u>Authority</u>. Each person executing this Amendment on behalf of a Party represents and warrants that it has the full power, authority, and legal right to execute and deliver this Amendment on behalf of such Party and that this Amendment constitutes the legal, valid and binding obligations of such Party, its heirs, representatives, successors and assigns, enforceable against such Party or Parties in accordance with its terms.

6.4   <u>Approvals</u>. Landlord warrants and represents to Tenant that Landlord has obtained any approvals from any third parties, including lender(s), that are necessary to make this Amendment enforceable against Landlord and all such third parties, their heirs, representatives, successors and assigns. Landlord shall defend, indemnify and save harmless Tenant from and against all losses, claims, demands, damages, liabilities, costs and attorneys' fees resulting from a breach of, or inaccuracy in, any of the representations and warranties set forth in this section.

6.5   <u>Counterparts</u>. To facilitate execution of this Amendment, this Amendment may be executed in one or more counterparts as may be convenient or required, and an executed copy of this Amendment delivered electronically by facsimile or e-mail shall have the effect of an original, executed instrument. All counterparts of this Amendment shall collectively constitute a single instrument; but, in making proof of this Amendment it shall not be necessary to produce or account for more than one such counterpart executed by each Party hereto. It shall not be necessary for the signature of, or on behalf of, each Party hereto, or that the signature of all persons required to bind any such Party appear on each counterpart of this Amendment.

6.6   <u>No Construction Against Draftsman</u>. No inference in favor of or against any Party shall be drawn from the fact that such Party has drafted any provision of this Amendment or that such provisions have been drafted on behalf of said Party.

3

5241-Santa Cruz

<u>STARBUCKS</u>

IN WITNESS WHEREOF, the Parties have duly executed this Amendment effective as of the day and year set forth above.

TENANT:

STARBUCKS CORPORATION, a Washington corporation

By: _____
Michael Malanga
Svp, Store Development Americas
And Global Real Estate

LANDLORD:

HEINZ P. GROSS,
Individually and as Trustor and Trustee of The Heinz Gross Living Trust dated November 9, 1995

By: _____
Name:  Heinz P. Gross
Its:      Landlord

URSULA M. SCHOLZ-GROSS

By: _____
Name:  Ursula M. Scholz-Gross
Its:      Landlord

5241-Santa Cruz

4

**STARBUCKS**

EXHIBIT B

New agreement with Starbucks to guaranty the Plumbing, leaks etc.

20 Apr 98   H.

by Attorney Joern-Eric Brugger

### SETTLEMENT AND RELEASE

FILED APR 20 1998

1.      FOR AND IN CONSIDERATION OF the payment of Thirty Five Thousand Dollars and No/100 ($35,000.00) and a waiver of costs in the below described action, HEINZ P. GROSS and URSULA M. SCHOLZ-GROSS, husband and wife, and THE HEINZ P. GROSS LIVING TRUST, by its Trustees, and all their heirs, executors, representatives, successors, assigns, receivers, conservators, trustees and administrators, (all of the foregoing being collectively referred to as "Claimants") do hereby fully and forever release, acquit and discharge STARBUCKS CORPORATION, a Washington Corporation d/b/a STARBUCKS COFFEE COMPANY ("Starbucks"), its subsidiaries and affiliates and their respective officers, directors, employees, heirs, executors, administrators, insurance carriers, contractors, agents, successors and assigns (all of the foregoing being collectively referred to for convenience as the "Defendants"), from any and all actions, causes of action, claims, demands, damages, costs, loss of services, expenses, compensation, obligations or liabilities of whatsoever kind or nature at law or in equity, known and unknown, existing, claimed to exist, or which can ever hereafter arise out of or result from or in connection with the plumbing installed by Starbucks or its contractors at the Demised Premises described below or related to the matters set forth in that certain Complaint No. DV 133783, entitled HEINZ GROSS v. STARBUCKS COFFEE COMPANY, and DOES 1 TO 50, et.al. filed in the Superior Court of the State of California, County of Santa Cruz (all of the foregoing being collectively referred to for convenience herein as the "Claims"). The Claimants hereby authorize and direct that payment of the aforesaid sum be made by check or draft payable to the attorneys of record of HEINZ P. GROSS in the aforementioned action and such check or draft be delivered to said attorneys. The Claimants will dismiss with prejudice the above-referenced Complaint and all other lawsuits related to the Claims.

2.      As additional consideration, Starbucks will warrant for the term of the Commercial Lease between Starbucks and the Heinz P. Gross Living Trust dated November 9, 1995 (the "Lease") the plumbing installed by Starbucks or its contractors. Starbucks will further, as additional consideration, paint the basement space occupied by Jenna Scientific Instruments which is located under the Leased Premises within ten (10) days of execution of this Settlement and Release by all parties. As additional consideration, Claimants will warrant the roof installed on the Leased Premises for five (5) years from the date of execution of this Settlement and Release by all parties, by responding to repair any leaks in such roof within five (5) days after receipt of written notice (including notice by facsimile) given to the Landlord of the Leased Premises, and proceeding thereafter with due diligence to complete such repairs. Further, the Claimants agree to the special considerations which follow.

3.      The liability for such Claims is denied by the Defendants and this final compromise and settlement thereof shall never be treated as an admission of liability or responsibility at any time for any purpose. Both Starbucks and the Claimants agree to keep the Claims and the terms and conditions of this Settlement and Release strictly confidential and to refrain completely and entirely from making disparaging remarks about the other or their related entities to third parties.

4.      The provisions of Section 1542 of the Civil Code of the State of California are hereby expressly waived and the Claimants understand that said section provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

5.      This Settlement and Release contains the entire agreement between the parties hereto, and the terms of this agreement are contractual and not a mere recital.

6.      The Claimants represent that there are no liens, claims or causes of action against the settlement payment and if any such liens, claims or causes of action exist, the Claimants agree to pay them or make some other disposition which will not prejudice the rights of the parties being released hereunder. Accordingly, the Claimants hereby indemnify and hold harmless the parties herein released

from any such liens, claims, or causes of action from any person and agree to defend the parties herein released from any such claims whether groundless or not.

The Claimants state they have carefully read the foregoing Settlement and Release and know the contents thereof, and sign the same as their own free act and it is their intention to be legally bound thereby.

STARBUCKS CORPORATION,
a Washington corporation

By: _____
Arthur Rubinfeld, sr. vice-president

_____
HEINZ P. GROSS

_____
URSULA M. SCHOLZ-GROSS

HEINZ P. GROSS LIVING TRUST

By: _____
HEINZ P. GROSS, TRUSTEE

By: _____
URSULA M. SCHOLZ-GROSS, TRUSTEE

As counsel for Claimants, I approve the foregoing Settlement and Release.

_____
JOERN-ERIC W. BRUGGER, ESQ.

THIS DOCUMENT MUST BE SIGNED IN FRONT OF A NOTARY AND ALL SIGNATURES
ACKNOWLEDGED BY THE NOTARY

2

STATE OF WASHINGTON    )
County of King          )  ss
                        )

    On this 16ᵗʰ day of April , 1998 , before me, the undersigned, a Notary Public in and for the State of Washington, personally appeared Arthur Rubinfeld, to me known as, or providing satisfactory evidence that he is the Senior Vice President of Starbucks Corporation, a Washington corporation, the corporation that executed the foregoing instrument and acknowledged the said instrument to be the free and voluntary act and deed of said corporation for the uses and purposes therein mentioned and stated that he is authorized to execute said instrument.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year last written above.



Patricia A. Eglin

Notary Public in and for the State of Washington
Residing at Duvall, WA
My commission expires: 11-29-98
Print Name: Patricia A. Eglin

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

No. 5907

State of **CALIFORNIA**

County of **SANTA CRUZ**

On **APRIL 23, 1998** before me, **THE UNDERSIGNED**
DATE                                    NAME, TITLE OF OFFICER - E.G., "JANE DOE, NOTARY PUBLIC"

personally appeared **HEINZ P. GROSS AND URSULA N. SCHOLZ-GROSS**
NAME(S) OF SIGNER(S)

☐ personally known to me - **OR** - ☒ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

MARDI KISLING
Comm. #1162448
NOTARY PUBLIC · CALIFORNIA
SANTA CRUZ COUNTY
Comm. Exp. Dec. 19, 2001

WITNESS my hand and official seal.

_____
SIGNATURE OF NOTARY

─────────────────── **OPTIONAL** ───────────────────

Though the data below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent reattachment of this form.

**CAPACITY CLAIMED BY SIGNER**

☐ INDIVIDUAL
☐ CORPORATE OFFICER

_____
TITLE(S)

☐ PARTNER(S)        ☐ LIMITED
                    ☐ GENERAL
☐ ATTORNEY-IN-FACT
☐ TRUSTEE(S)
☐ GUARDIAN/CONSERVATOR
☐ OTHER: _____

SIGNER IS REPRESENTING:
NAME OF PERSON(S) OR ENTITY(IES)

_____
_____

**DESCRIPTION OF ATTACHED DOCUMENT**

_____
TITLE OR TYPE OF DOCUMENT

_____
NUMBER OF PAGES

_____
DATE OF DOCUMENT

_____
SIGNER(S) OTHER THAN NAMED ABOVE

©1993 NATIONAL NOTARY ASSOCIATION • 8236 Remmel Ave., P.O. Box 7184 • Canoga Park, CA 91309-7184

EXHIBIT C



AUGUST 25, 2017 6:00 PM

ANYTIME PLUMBING


















